

NUMBER 13-12-00187-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF M.W.H., C.L.H., S.D.L.H., AND T.M.H., CHILDREN

### On appeal from the County Court at Law of Aransas County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Perkes Memorandum Opinion by Justice Benavides**

This appeal involves the involuntary termination of parental rights of appellants C.W.H. ("Father") and K.L.B. ("Mother") over M.W.H., C.L.H., S.D.L.H., and T.M.H. (collectively "children," unless otherwise noted).[1] By four issues, Father, Mother, and cross-appellants, R.B. and J.B. ("Grandmother" and "Grandfather," respectively) assert

---

[1] We will use aliases for the parties involved in order to protect the minors' identities. *See* TEX. R. APP. P. 9.8(b)(2).

on appeal that: (1) the trial did not commence within the statutory procedural deadlines articulated in the family code; (2) the evidence was factually insufficient to support the trial court's clear and convincing finding that termination of Mother's and Father's parental rights was in the children's best interest; (3) the evidence was factually insufficient to support the trial court's denial of Grandparents' intervention; and (4) the trial court's findings of fact and conclusions of law lack specificity to support a judgment terminating parental rights. We reverse and remand.

## I. BACKGROUND

On the afternoon of July 11, 2010, Baby A. was found non-responsive, not breathing, and slumped over in the front passenger's seat of Father's sports utility vehicle parked outside the family's trailer home in Aransas Pass. Baby A. was taken to Driscoll Children's Hospital in Corpus Christi, where he was pronounced dead from hyperthermia. Appellee, the Department of Family and Protective Services ("the Department"), assumed care of Father and Mother's other children and obtained a court order which appointed the Department temporary managing conservator. The children were placed in a children's advocacy center while the Department implemented a "Family Service Plan" with the parents.

### A. The Trial

A bench trial commenced to terminate Father and Mother's parental rights over Children, wherein the following evidence and testimony was received:

### 1. Sheriff's Investigator Stan Powell

2

Investigator Powell was one of the first responders to the scene where Baby A. was found. During his initial investigation, Investigator Powell took several photographs which were admitted into evidence and showed the conditions of the trailer home where the children lived at the time and inside the vehicle where Baby A. was located. Investigator Powell testified that he found the surrounding area with "junk" piled up around the trailer. Investigator Powell further testified that through the course of his investigation, he determined that at the time of Baby A.'s death, Father was asleep inside the trailer home and Mother was cooking lunch at a next-door neighbor's home.

## 2. Department Investigator Keri Cass

Cass was the initial investigator assigned to this particular case and first responded on behalf of the Department at Driscoll Children's Hospital. Once there, Cass interviewed Mother and the other children. Cass later met with Father and Grandmother at their respective residences. At the hospital, M.W.H., C.L.H., and S.D.L.H. were examined by medical personnel. Cass testified that the children were dirty and had poor hygiene. Cass noted that C.L.H. had bruising on her buttocks, and S.D.L.H., who was six months old at the time, appeared to have developmental difficulties due to nutritional neglect. Approximately four hours after Baby A.'s death, Cass administered an oral-swab drug test on Mother, which tested positive for amphetamines and methamphetamines. A drug test was also administered on Father, which yielded the same results.

Cass testified that the Department discussed possible placement with Grandmother and Grandfather, but the Department expressed concern about the

3

grandparents' prior lack of supervision over the children, safety conditions around the grandparents' residence, which was in the same trailer park as Mother and Father's residence, and Grandfather's purported alcohol use.

### 3.    Department Caseworker Virginia Piaz

Piaz testified that Mother and Father entered into a Family Service Plan with the Department.    Piaz described the plan as a set of tasks that the Department asks parents to complete to further the mutual goal of reunification with the children.    In August 2010, Father, Mother, and the Department entered into the plan.    Several initial concerns were outlined in the plan, including:  (1) nutritional failures and developmental issues as to S.D.L.H.; (2) drug use by both parents; (3) the death of Baby A. due to lack of supervision; (4) bruising on C.L.H.'s body; and (5) unsanitary and hazardous living conditions.    Several goals were also outlined in the plan, including lifestyle changes to reduce the risk of injury and neglect upon the children.    Some of these goals included: (1) a willingness and ability to protect the children from harm; (2) a demonstrative ability to stay drug free; (3) an ability to provide basic necessities for the children such as food, clothing, shelter, care, and supervision; (4) the maintenance of a safe and hazard-free home; and (5) a demonstrative ability to change the pattern of behavior that resulted in the abuse and neglect.    Piaz testified that during the implementation of the Family Service Plan, the Department was "constantly monitoring" Mother and Father's progress.    During the implementation, Mother and Father complied with the Department's plan and: (1) participated in all drug testing; (2) paid monthly child

4

support; (3) acquired a two-bedroom apartment; (4) attended mental health evaluations; and (5) Father obtained steady employment.

Piaz stated that since the initial removal of the children, the Department's goal was always to reunify the family. In August 2011, Mother and Father entered respective pleas of guilty to the second-degree felony offense of injury to a child arising out of Baby A.'s death. *See* TEX. PENAL CODE ANN. § 22.04 (West 2011). The trial court sentenced Mother and Father to a term of two years' confinement in the Texas Department of Criminal Justice's Institutional Division and imposed a $500.00 fine.[2] While in prison, Mother gave birth to T.M.H., who, according to testimony, was a healthy baby. The Department assumed care of T.M.H. shortly after his birth.

Piaz testified that the criminal convictions of Mother and Father, the statutory time constraints of the Department's action plan, *see* TEX. FAM. CODE ANN. § 263.401 (West 2008), and other concerns about Mother and Father's abilities to parent without supervision in the future, presented a dilemma for the Department. Therefore, the Department decided to change its position from reunification to termination. Piaz testified to the trial court that the Department's position was to terminate parental rights of Mother and Father on grounds D, E, and L of section 161.001 of the family code and that termination was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(1)(D)–(E), (L); *id.* § 161.001(2) (West Supp. 2011). Piaz also testified that if termination was ordered, the Department felt that placing the children with the

---

[2] Prior to these convictions, the record shows that only Father had a prior criminal record which stemmed from a September 15, 2006 charge for possession of marijuana in an amount less than or equal to two ounces in a drug free zone. He was found guilty and sentenced to one-year probation.

grandparents was also not in the children's best interest based on results from a home study.

**4. Case Analyst Libby Bryars**

Bryars is a case analyst with the Department and conducted an independent assessment on Grandmother and Grandfather's home. Bryars testified that during her study, she visited the grandparents' home and noted the following concerns: (1) the yard was without fencing; (2) Grandmother and Grandfather were not concerned about the unsanitary conditions of the home where the children lived with Mother and Father; (3) the physical appearance of the home needed repair; (4) Grandmother and Grandfather did not own adequate transportation for all of the children; and (5) although Grandmother and Grandfather appeared to have adequate physical health to care for their grandchildren, it would be difficult for them to care for their grandchildren.

Bryars included in her report that Grandfather stated to her that having the four grandchildren live with them would pose no problem and that they would "do whatever it takes to get [their] grandbabies in [their home]" because the grandchildren were very important to them. Bryars also noted in her home assessment that the grandparents attended church regularly, and the children would attend with them. The grandparents also indicated to Bryars that they would "ensure that all of [the children's] needs [were] taken care of." Bryars testified that her report was given to the Department, where a Department supervisor recommended that the children be placed elsewhere.

**5. H.B. and R.B.**

Mother's sister, H.B., and cousin, R.B., also testified. H.B. testified that she had told police that she witnessed the children run up and down the road in the trailer park unattended on more than one occasion. H.B. stated that she believed Baby A.'s death was an accident and that the children should be returned to Mother and Father because Mother was "not the same person [that] she was" before the accidental death. H.B. indicated that since Baby A.'s death, Mother and Father's attitudes and responsibilities had changed for the better. H.B. testified that Mother and Father complied with the Family Service Plan and learned from it. H.B. admitted that she told police shortly after Baby A.'s death that she did not think it was in the best interests of the children to live with Mother and Father because she was angry with them for Baby A.'s death. However, H.B.'s opinion changed at trial when she testified that to return the children to Mother and Father would be in the children's best interest. R.B. offered cumulative testimony about the state of Mother and Father's trailer prior to the Department's intervention. R.B. opined that it would not be in the children's best interest to return them to Mother and Father or to their grandparents but admitted that she allowed her son to stay with Mother and Father when she experienced problems with her son and had not communicated with Mother and Father since the Department's intervention.

**6.     Grandmother, Grandfather, and Others**

Grandmother testified that nothing was unusual in her health and that she disputed the social study conducted by Bryars which indicated that she and her husband would be physically unable to take care of the children. Grandmother testified that she was ready, willing, and able to adopt the children, if the trial court terminated

Mother's and Father's parental rights. Grandfather testified that he did not notice any troubles associated with Mother's and Father's care for the children prior to Baby A.'s death because he works a lot of hours; however, he testified that had he noticed anything, he would have said something to them. Grandfather also testified that it was in the children's best interest to be raised by him and Grandmother if the trial court terminated Mother's and Father's parental rights. Finally, Grandfather testified that he was financially and emotionally prepared to take care of the children if the opportunity was given.

Other witnesses testified on behalf of Grandmother and Grandfather, including Pastor Charles Stotts of Salvation Station Bible Church. Pastor Stotts testified that he visited the grandparents' home several times to help them rebuild their trailer home after a fire destroyed the first one. Pastor Stotts told the trial court that he believed it was in the children's best interests to be with their family members because he found them to be a loving and caring family. Finally, Pastor Stotts testified that he had no reservation about the children being placed in Grandmother and Grandfather's care and that he would allow his own grandchildren to stay with them. Roy Snead also testified on behalf of Grandmother and Grandfather. Snead described Grandfather as trustworthy, reliable, and a friend for the last twenty-nine years. Snead stated that he had no reservations about Grandmother and Grandfather's abilities to raise their four grandchildren.

7.    CASA Volunteers

Marcella Simmons was one of the original court-appointed special advocate (CASA) volunteers assigned to the case. Simmons worked the case for approximately fifteen months and followed the Department's plan for reunification. Simmons testified that during that time she monitored the children's visits with Mother and Father, visited with the children, visited Mother and Father at their home, and visited the grandparents' home. Simmons stated that she was "definitely not" in favor of termination because she observed noticeable changes in Mother and Father during their visits with the children and felt that they were doing very well together. Simmons described Mother and Father's new apartment as a clean, two-bedroom home.

Simmons also described Grandmother and Grandfather's new trailer home as "clean" and "better than most trailers" she had seen in other cases. Simmons testified that she noticed a "big turn-around," describing how much Mother and Father had changed during the administration of the Family Service Plan. Simmons found that a noticeable bond existed between the children and their parents as well as with their grandparents. Simmons testified, however, that she removed herself from the present case because she had a difference of opinion with another CASA volunteer, Marcie Rowe. According to Simmons, Rowe "wanted termination," while Simmons did not. Simmons testified that she and Rowe shared the same goal of reunification up until the criminal sentencing of Mother and Father, when Rowe's viewpoint on the case changed but Simmons's did not.

CASA volunteer Rowe offered her report to the trial court. In her report, Rowe detailed that during her visitations with the children, their parents, and with their

grandparents. Rowe stated that Mother, Father, Grandmother, and Grandfather showed "a lot of love" for the children. Rowe noted that she was concerned with the healthy parenting abilities of Mother and Father during the visits. Rowe noted immediate changes in M.W.H. and C.L.H. during their foster care and expressed concern with Mother and Father's lack of structure, rules, and enforcement with their children. Rowe also testified that S.D.L.H. and newborn T.M.H. did not know their biological parents and only knew a home "where there is structure, where there [are] rules, [and] where there's hygiene." Rowe did note improvement on the part of Mother and Father, but also mentioned that the visitations were conducted in a "very structured environment," where Mother, Father, Grandmother, and Grandfather know that they are being monitored. Rowe testified that Mother and Father took what the Department said "very seriously," and both were "capable of learning," but had a "long way to go." Prior to Mother's and Father's respective incarcerations, Rowe stated that she began to see "some relational, good, healthy things going on there." However, Rowe expressed concerns over "generational issues" with Mother and Father, which Rowe contributed to Baby A.'s death. Rowe stated that those same concerns existed at the time of trial. Further, Rowe testified that she "had no clue" what was going happen, or could happen, if the children were returned to Mother and Father's care.

Specifically as to Grandmother and Grandfather, Rowe noted two separate incidents. The first dealt with an offhand remark made by Grandmother at a court proceeding which Rowe found "very disturbing" because it appeared to Rowe as if

10

Grandmother treated these proceedings as normal.[3]  Rowe recalled a second incident when she and fellow CASA volunteer Simmons visited Grandmother and Grandfather's home and Grandfather used a leather belt to hit one of the dogs to keep the dog away from the CASA workers.[4]  Rowe testified that she found this behavior toward the dogs concerning.

Based on her observations and report, Rowe stated that the obvious love that Mother, Father, Grandmother, and Grandfather felt for the children was not the issue, instead it was the other issues that controlled. Accordingly, Rowe told the trial court that she could not recommend that it would be in the children's best interest to return them to their family.

## B.    Trial Court's Order, Findings of Fact, and Conclusions of Law

At the conclusion of the case, the trial court ordered Father and Mother's parental rights to M.W.H., C.L.H., S.D.L.H., and T.M.H. terminated.  The trial court found by clear and convincing evidence that Mother and Father: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children, *see* TEX. FAM. CODE ANN. § 161.001(1)(D); (2) engaged in conduct or knowingly placed the children with a person who engaged in conduct which endangered the physical or emotional well-being of the child, *see id.* § 161.001(1)(E); (3) have been convicted or have been placed on

---

[3] The statement involved a conversation between Rowe and Grandmother at the courthouse in which Rowe apologized to Grandmother for being in court proceedings despite it being a beautiful day outside. Grandmother responded to Rowe, in a laughing manner, that they were there "all the time with family and friends."

[4] According to Rowe, CASA volunteer Simmons was "very afraid" of dogs during the visit.

11

community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child under section 22.04 of the Texas Penal Code, *see id.* § 161.001(1)(L)(ix); and (4) that termination of the parental-child relationship was in the best interest of the children. *See id.* § 161.001(2).

The trial court also denied the grandparents' intervention as to all of the children and ordered that the Department be appointed permanent managing conservator of the children. This accelerated appeal ensued. *See id.* § 263.405 (West Supp. 2011).

## II.    COMMENCEMENT OF TRIAL

By their first issue, Mother, Father, Grandmother, and Grandfather assert that the parental termination trial did not timely commence and should have been dismissed.[5]

## A.    Applicable Law

Section 263.401 mandates dismissal by a trial court of a parental termination suit when a trial on the merits has not commenced by the first Monday following one year after the date the court rendered a temporary order appointing the Department as a temporary managing conservator. *Id.* § 263.401(a). An extension may be granted for a period not to exceed 180 days in which to commence a trial on the merits. *Id.* § 263.401(a)–(b). However, a party "who fails to make a timely motion to dismiss the suit under this subchapter waives the right to object to the court's failure to dismiss the suit." *Id.* § 263.402(b). A motion to dismiss under this subsection is timely if the motion is made before the trial on the merits commences. *Id.*

---

[5] We consolidate Mother, Father, Grandmother, and Grandfather's first, second, and third issues into one issue. *See* TEX. R. APP. P. 47.1

12

The Texas Supreme Court has held that "nothing in the language of section 263.401 indicates that these deadlines are jurisdictional." *In re Dep't of Fam. & Protective Servs.*, 273 S.W.3d 637, 642 (Tex. 2009). The rationale behind this interpretation is section 263.402's waiver provision. According to the high court, if the Texas Legislature intended for the dismissal provision to be jurisdictional, it would not have expressly permitted it to be waived. *Id.*

## B.    Discussion

As a threshold matter, the Department argues that Mother, Father, Grandmother, and Grandfather's first issue was waived because error was not properly preserved. *See* TEX. R. APP. P. 33.1(a).[6]  To counter, Mother, Father, Grandmother, and Grandfather collectively argue that waiver is not applicable because a trial did not timely "commence" as required under section 263.401, and thus, the proceeding was a "sham."

The record shows that the trial court ordered the Department be appointed temporary managing conservator of the children on July 13, 2010. Within one year, the trial court extended the deadline to commence trial until December 15, 2011. *See* TEX. FAM. CODE ANN. § 263.401(b). On November 30, 2011, the case was called on the docket with all parties, except the trial judge, physically present. The trial judge presided telephonically. All sides announced "ready," one witness was sworn in, and

---

[6] The rule requires that as a prerequisite to presenting a complaint for appellate review, the record must show that: (1) the complaint was made to the trial court by a timely request, objection, or motion that: stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware, and that it complied with the rules of evidence and procedure; and (2) that the trial court either explicitly or implied ruled on the complaint or refused to rule. *See* TEX. R. APP. P. 33.1.

13

then, the trial court recessed and reset the trial for a later date. The visiting trial judge presided telephonically.[7] Mother, Father, Grandmother, and Grandfather argue that because the trial judge appeared for trial by telephone, the proceeding was void; and therefore, the formal commencement of the trial did not take place until after the December 15, 2011 deadline and waiver is negated. We disagree.

Assuming without deciding that the telephonic hearing on November 30, 2011 was not proper "commencement" under section 263.401, and thereby a "sham" as the appellants contend, error was not properly preserved through a motion or objection with a ruling at the telephonic proceeding on November 30, 2011. Error was also not properly preserved through a motion to dismiss on February 10, 2012, when the in-person trial commenced. Accordingly, we conclude that Mother, Father, Grandmother, and Grandfather failed to properly preserve error on this issue, and it is waived. *See* Tex. Fam. Code Ann. § 263.402(b); Tex. R. App. P. 33.1(a).

Alternatively, Mother and Father argue that failure to file an objection or motion was the result of ineffective assistance of counsel and should warrant reversal. Again, we disagree. Texas provides for a statutory right to counsel for indigent persons in parental-rights termination cases. *See In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003) (referencing Tex. Fam. Code Ann. § 107.013(a)(1) (West Supp. 2011)). This statutory right to counsel in parental termination cases "embodies the right to effective counsel." *See In re M.S.*, 115 S.W.3d at 544. The Texas Supreme Court notes that when

---

[7] This case originates out of Judge William Adams's Aransas County Court-at-Law. On November 22, 2011, Judge Adams was suspended by the Supreme Court of Texas, pending final disposition of allegations made against him. Accordingly, visiting trial judge Stephen Williams was appointed to preside over this case.

considering a claim for ineffective assistance of counsel on a parental termination case, a reviewing court should use *Strickland* guidelines. *Id.; see Strickland v. Washington*, 466 U.S. 668, 687–96 (1984). Under *Strickland*, the United States Supreme Court stated the burden of proof for an ineffective assistance of counsel claim:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. In our review for ineffective assistance of counsel, we must take into account all the circumstances surrounding the case and must primarily focus on whether counsel performed in a "reasonably effective" manner. *In re M.S.*, 115 S.W.3d at 545. Further, we must give "great deference" to counsel's performance, "indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," including the possibility that counsel's actions are strategic. *Id.* Only when conduct is so outrageous that no competent attorney would have engaged in it will it constitute ineffective assistance. *See id.*

After review of the record, in addition to Mother's and Father's briefs, we cannot conclude that Mother's and Father's respective trial counsel's failure to file a motion to dismiss or object at the November 30, 2011 proceedings was not the result of sound trial strategy, nor can we conclude that failure to file an objection or motion to dismiss was "so outrageous that no competent attorney would have engaged in it." *See id.*

Accordingly, Mother, Father, Grandmother, and Grandfather's consolidated first issue is overruled.

## III. TERMINATION OF MOTHER'S AND FATHER'S PARENTAL RIGHTS

In their second issue, Mother, Father, Grandmother, and Grandfather contend that the evidence is factually insufficient to support a clear and convincing finding by the trial court that termination of Mother and Father's parental rights was in the children's best interests.[8]

### A. Applicable Law and Standard of Review

A court may order the termination of a parent-child relationship if it is shown by clear and convincing evidence that a parent has met at least one of the statutory factors listed in the family code, coupled with an additional finding by clear and convincing evidence that termination is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 261 (Tex. 2002) (noting the two-prong test in deciding parental termination and that one act or omission of conduct satisfies the first prong); *In re E.M.N.*, 221 S.W.3d 815, 820–21 (Tex. App.—Fort Worth 2007, no pet.). We review challenges to the factual sufficiency of the evidence in a termination proceeding by giving "due deference to a jury's factfindings . . ." and we do not "supplant the jury's judgment" with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). In our review, we should "inquire 'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [ ]

---

[8] The Department argues that Grandmother and Grandfather do not have standing to assert this issue on appeal because they are intervenors in the action. We agree. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 843 (recognizing that "Texas courts have long held that an appealing party may not complain of errors that do not injuriously affect it or that merely affect the rights of others"). Accordingly, we overrule Grandmother and Grandfather's second issue.

16

allegations'" from the entire record. *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). This heightened standard of review is mandated not only by the Family code, *see* TEX. FAM. CODE ANN. § 161.001, but also the Due Process Clause of the United States Constitution. *In re E.N.C.*, No. 11-0713, 2012 WL 4840710, at *4 (Tex. Oct. 12, 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982)). We strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 2012 WL 4840710, at *4.

## B.     Discussion

Mother's and Father's briefs appear to argue error solely with regard to the trial court's finding by clear and convincing evidence that termination of Mother's and Father's parental rights over M.W.H., C.L.H., S.D.L.H., and T.M.H were in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(2). Therefore, we will address only that prong of section 161.001 in this analysis.

The Texas Supreme Court has provided an often-cited, non-exhaustive list of factors that courts may consider in ascertaining the best interests of a child. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Among them are:

(1) the desires of the child;

(2) emotional and physical needs of the child now and in the future;

(3) emotional and physical danger to the child now and in the future;

(4) parental abilities of individuals seeking custody;

(5) programs available to assist individuals to promote the best interest of the child;

(6) plans for the child by these individuals or by the agency seeking custody;

17

(7) stability of the home or proposed placement;

(8) acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

*Id.*

Aside from these listed factors, we must take into account other considerations under an elevated standard of review because a "parental rights termination proceeding encumbers a value 'far more precious than any property right' and is consequently governed by special rules." *In re E.R.*, No.11-0282, 2012 WL 2617604, at *1, (Tex. July 6, 2012) (quoting *Santosky v. Kramer*, 455 U.S. at 758). In these cases, we are "faced not with the ordinary dispute about how to allocate money in a contract or tort action," but instead, we must decide how to reconcile "a parent's desire to raise [the] child with the State's responsibility to promote the child's best interest." *In re E.R.*, 2012 WL 2617604, at *1.

Nothing in the record expressly demonstrates any of the children's desires in this case, almost certainly due to their young ages. The children range in ages from 16-months to six years. The record does indicate, however, that the children were happy when they spent time with Mother and Father and family. With regard to the emotional needs of the children, varying degrees of evidence were presented on this point. Certainly the emotional and physical needs of the children now and in the future are tremendous as they continue to grow and mature. CASA volunteer Simmons testified that she noticed an emotional bond between the children and their parents and grandparents during the visitations. Similar feelings of love and emotional bonding were

18

noticed as well by CASA volunteer Rowe. Looking to the future, the record shows that Mother and Father have improved their living and financial conditions greatly and are willing to continue to do so in order to support the physical and emotional needs of the children. We recognize that a difference of opinion exists on the parental abilities of Mother and Father in this case. The CASA volunteers who observed and studied the environment, lifestyle, and progress of Mother and Father have conflicting viewpoints about whether Mother and Father possess sufficient ability to continue raising their children or whether they will be able to provide a stable home environment for the children. It is also worth noting also that Mother and Father have maintained sobriety during the course of this case.

Nevertheless, there is no doubt—due to the death of Baby A. and the previous living conditions which Mother and Father fostered—that concerns over the physical and emotional dangers now and in the future are worth examination. CASA volunteer Rowe testified that her concern is not so much with the present, but what will happen to the children in the future, once the watchful eyes of the Department are lifted. The record does not indicate, however, that moving forward with reunification would create a repeat of the prior living environment or that poor physical conditions of the children will reoccur due to present circumstances.

To the contrary, testimony shows that reunification remained a consistent goal of the Department until Mother and Father's respective plea bargains and statutory time constraints changed the Department's outlook. Rowe's testimony appears to be quite speculative and insufficient to overcome our elevated standard of review. While we do

not deny that the Department's concerns are genuine, we cannot gloss over the Department's undisputed stated goal of reunification, as stipulated in the Family Service Plan. Furthermore, Mother's and Father's substantial compliance with the Family Service Plan shows a deep commitment to the goal of reunification, as opposed to parents who are non-compliant with their family service plans and termination is warranted. *See In re M.G.D.*, 108 S.W.3d 508, 515 (Tex. App.—Houston [14th Dist.] 2003, pet denied) (noting that compliance with the Department's family service plan is one factor to consider in a best interest analysis).

Past omissions, including Mother's and Father's convictions stemming from Baby A.'s death, also deserve serious pause when factoring the best interests of these children.[9] The record shows that the Department sought reunification even after Baby A.'s death. Instead, many of the Department's concerns moving forward are speculative in nature of an unknown future, including unspecified and undefined "generational issues." The record shows that at the time of the Department's involvement, Mother and Father's respective ages were 21 and 23, while Grandmother and Grandfather's respective ages were 43 and 47. The Department's concerns were further exacerbated by the pressures of a running statutory timeline to bring this termination proceeding before the trial court. For Mother and Father, the tragic loss of

---

[9] The Department's records admitted into evidence show that Mother and Father missed numerous required counseling sessions. The record, however, is unclear whether this also means they missed drug tests scheduled for those times. The Department's records further show that Mother and Father, during counseling, both denied prior methamphetamine use, despite both having tested positive for methamphetamines just after Baby A's death. Lastly, the records reference two prior CPS investigations of Mother and Father, one in each of 2006 and 2008. The Department's records admitted into evidence, however, failed to include any report or other documentation concerning those CPS investigations.

20

their child and subsequent conviction related to that death should not foreclose upon the shared and stated goal of reunification—especially after a demonstrated commitment and willingness to reform and move forward to provide emotional and physical support now and in the future for their children.[10] Baby A.'s tragic and untimely death will most certainly remain in Mother and Father's minds for the rest of their lives. If shared and undisputed goals of reunification are to be given any weight and effect when factoring a child's best interest, one factor cannot be dispositive over the others, simply because the statutory time clock is ticking, or of the emotionally-charged nature of a particular case. *See In re E.N.C.*, 2012 WL 4840710, at *4 (holding that "the Department is required to support its allegations against a parent by clear and convincing evidence; conjecture is not enough").

For the foregoing reasons, even with giving due deference to the trial court's findings, we cannot conclude that the evidence is factually sufficient to support a reasonable trier of fact's firm belief or conviction that termination of Mother and Father's parental rights were in M.W.H., C.L.H., S.D.L.H., and T.M.H.'s best interests. *See In re C.H.*, 89 S.W.3d at 28–29.

We sustain Mother and Father's second issue.[11]

---

[10] According to Father's brief, Father has been released from prison.

[11] Because we have sustained Mother's and Father's second issue, we need not address the remaining issues on appeal. *See* TEX. R. APP. P. 47.1.

21

## IV.    CONCLUSION

Because the evidence was factually insufficient to show that it was in the children's best interest to terminate Mother's and Father's parental rights, we reverse the trial court's judgment and remand the case for a new trial.

_____
GINA BENAVIDES
Justice

Delivered and filed the
29th day of November, 2012.